OBADIAH HARRIS et al., Appellants, v. CHARLES McLARAN, Appellee.

30    533
91    426
e91   427

1. CHATTELS : PARTIAL INTERESTS IN.—Partial and reversionary interests in chattels personal are now recognized both by courts of law and equity.

2. SAME : REVERSIONS.—Reversionary interests or *quasi* reversions, in chattels personal, exist now in all cases, where partial interests *alone* are created in them, and in all cases in which partial interests are created, with limitations over which fail to take effect, or which are void *ab initio*, or which become void, except in those cases where an intention to dispose of the whole interest is apparent, and also, except where conditional limitations are engrafted upon *such interests* in the first taker, as would, in the absence of the limitations, amount to a fee.   See 1 Dev. & Batt. 334; *Price* v. *Telly*, 10 Ala. 950; *Guiger* v. *Brown*, 2 Strobh. 359; 1 Bailey, L. R. 100; *Powell* v. *Brown*, 1 Bailey, 120; Law Repos. 469; 1 Bailey, L. R. 643; *Vannerson* v. *Culbertson*, 10 S. & M. 150.

3. SAME : LIMITATIONS OF.—In cases where partial interests are created in personal chattels with limitations over, which are void, or become void, or fail to take effect, the absolute interest in fee is vested in the first taker, wherever it is apparent that the grantor intended to dispose of the *whole* interest in the chattels, and wherever the interest of the first taker would be absolute, except for the attempted limitation over.

4. REMAINDER : CANNOT BE LIMITED TO HEIRS OF THE DONOR.—It is a settled maxim of common law, that a person cannot make a conveyance of realty to "his own right heirs ;" and a remainder thus limited is void, and will remain in the grantor as his old reversion, and his heirs at his death will take by descent, and not by purchase.   This principle is as applicable to conveyances of personalty, as of realty, and extends to gifts to "next of kin," "distributees," &c.   See Fearne on Rem. 49; 1 Prest. on Estates, 290; 2 Atk. 56; 12 East, 589; 1 Hill. Abr. 199, § 28; 367, § 31; 419, § 8; 1 Tuck. Com. 135.

5. CHATTELS : SUCCESSION TO : BY DISTRIBUTION AND NOT BY DESCENT.—Heirs, as such, do not succeed to the personalty of the ancestor, in virtue of the title by descent. The personalty goes to the administrator for the payment of debts, and then for distributions; hence, the term "heirs," used in connection with personal estate only, is equivalent to legal representatives.   Keyes on Chattels, 46.

6. SAME : VOID LIMITATION OF : HOW AFFECTS ESTATE OF FIRST TAKER.—If a partial interest in personal chattels be vested in A. with remainder to the lawful heirs of the donor, the remainder is void, and will go to A., the first taker, as his absolute estate, or remain in the donor as his old reversion, according as it shall appear from the instrument of gift, that it was the intention of the donor to dispose of the whole interest in them, or not; but in no case will any interest be vested thereby in the heirs.

Harris et al. *v.* McLaran.

7. HEIR: RIGHT OF DONEE FOR LIFE TO TAKE REVERSION AS HEIR OR NEXT OF KIN.—
The limitation of a life estate in personal chattels to a donee will not prevent
him from taking the reversion as next of kin to the donor. *Holloway* v. *Hollo-*
*way*, 5 Ves. jr. 399.

8. HEIR AND NEXT OF KIN: WHO ARE.—Those who seek distribution of an intestate's
personal chattels, must show that they *are his next of kin, at the time of his death;*
for it is precisely at that point of time when their title becomes vested, if at all.
See 2 Prest. on Estate, 37; 2 Atk. 57; 12 East, 589; 5 Ves. jr. 399; 3 East,
290.

9. CHATTELS: VOID LIMITATION OF: REMAINDER: REVERSION.—A., the father, gave
to C., in trust for B. his only child, several slaves for life, and after her death to
her child or children, and in default of issue living at her death, then to the
lawful heirs of A. the donor. A. died leaving B. his only heir at law, who
afterwards died without issue. *Held*, that an absolute estate in fee vested in B.
by the terms of the gift; but if it were otherwise, the limitation over to his law-
ful heirs remained in A. as his old reversion, and at his death went to B. as his
next of kin, and not to those, who by the death of B., became next of kin.

APPEAL from the District Chancery Court at Columbus. Hon.
Henry Dickinson, judge.

The appellants, who are the collateral relations of John Thur-
man, deceased, being the descendants of his brothers and sisters
who were living at the time of death, filed their bill in the court
below, to recover about eighty slaves and their hire, from the
appellee, Charles McLaran. They claimed as heirs of John Thur-
man, and his next of kin, after the death of Mrs. Eliza McLaran,.
which took place in 1850.

They claimed title under the following deed of trust, which was
duly executed and delivered in Morgan county, Alabama, on the
day of its date, viz. : "Know all men by these presents, that I,
John Thurman, of Morgan county, State of Alabama, for and in
consideration of the natural love and affection which I bear to my
daughter, Eliza Irion Thurman, and wishing to provide for her
future support and maintenance, and for the further sum of one
dollar to me paid by Isaac Lane, of said county, and state afore-
said; do hereby give, grant and convey unto the said trustee,
for the use of my said daughter, Eliza Irion Thurman, who is at
this time a minor, the following negro slaves, to wit," (here follows
the names of the slaves.) "But it is understood, that the property
hereby conveyed, is to remain in my possession and under my con-

trol, until my said daughter Eliza shall marry, without charge on my part, and after that event, should it take place, to be under the control of my trustee, as hereinbefore named, to be managed by him, the said trustee, as he may think most to the interest of my said daughter, so that she shall have the profits of said negroes annually, during her life, and after her death, to belong to the child or children of my said daughter; but should she die without living issue, then and in that case, the slaves before named, and their increase, shall return to my lawful heirs.    October, 1831.

JOHN THURMAN, [SEAL.]"

In 1832, Eliza Thurman married the appellee in Alabama, where they were both domiciled, and the property was then delivered to her.    In 1833, appellee was appointed by the proper authority in Alabama, trustee for his wife, in place of Lane, who had resigned.    Afterwards in the same year, on 25th of September, Charles McLaren and his wife, and John Thurman, all united in a deed, which, after reciting the appointment of Charles McLaren, as trustee, and that the first deed was made to protect said Eliza from an improvident marriage, and that she had now married suitably to said John Thurman, that therefore it was not necessary to continue it in force, and to enable said Thurman to make a suitable disposition of the property, he surrendered the property thereby conveyed, to John Thurman.    On the same day John Thurman conveyed the same property to Charles McLaran and his wife, jointly.    McLaran insisted that this last conveyance was made for a valuable consideration, and that he was therefore a purchaser for value; but it is unnecessary to set out the evidence on this point.

John Thurman died in Alabama, in 1839, leaving Mrs. McLaran his only heir, and a widow, who is still living.    The appellee administered on his estate, and distributed it between his wife and the widow of John Thurman, taking no notice in his administration account, of the slaves conveyed in the deed of trust to Lane, and which are now in controversy.    Mrs. McLaran died without issue, in this state in 1851, whither McLaran had removed several years previously, and where he was then domiciled.

Harris et al. *v.* McLaran.

Upon final hearing, the vice chancellor decreed for McLaran, and the complainants appealed.

*C. R. Crusoe,* for appellants.

John Thurman, through whom both parties claim, on the 18th of October, 1831, executed and delivered to Isaac Lane, as trustee, the instrument under which complainants claim. This instrument contained the following provisions and trusts : " That the property hereby conveyed, is to remain in my possession and under my control, until my daughter Eliza shall marry, without charge on my part, and after that event, should it take place, to be under the control of my trustee, as hereinbefore named, to be managed by him, the said trustee, as he may think most to the interest of my said daughter, so that she shall have *the profits of said negroes, annually,* during her life, and after her death to belong to the child or children of my said daughter. But should she die without *living* issue, then, and in that case, the slaves before named and their increase shall *return* to my lawful heirs."

The point in controversy is, who is entitled to the property, the complainants or the defendant, the husband of Eliza McLaran, formerly Eliza Irion Thurman. The deeds were executed in the state of Alabama, by residents of that state—hence their validity ; and the rights vested thereby will be governed by the laws of that state. *Carroll* v. *Renich,* 7 S. & M. 804.

A voluntary deed of slaves, reserving a life estate even in grantor, is valid at common law; and against grantor and his representatives, when delivered, vests the title in grantee. *Adams* v. *Broughton,* 13 Ala. 731 ; 14 Ib. 437 ; 15 Ib. 406. And though the deed be retained by grantor until his death, it is valid. 1 Johns. C. R. 336. So a deed may be made to take effect upon future contingency. 2 Brev. R. 38 ; Keyes, Chat. 263 ; 9 Gill & Johns. 77.

It is however said, there was no delivery of the slaves ; that the delivery of a deed of personal property, unaccompanied by delivery of possession, will not pass title, and is but a contract. We do not admit there was no delivery of the property ; but for the sake of argument, conceding this to be true, we assert that by the law of Alabama—which must govern—a delivery of the deed was

sufficient to pass title. *McCrae* v. *Peques*, 4 Ala. 165; *Foster* v. *Mitchell*, 15 Ib. 574; 18 Ib. 32.

From a review of the Alabama cases, we think it clear, that at least in that state, as against any one, except a creditor or purchaser for value, the title to personal property will pass by delivery of a deed, though there is no delivery of property. See, also, Keyes, Chat. 263, § 361, the author of which is now one of the chancellors of Alabama. To same point see *Banks* v. *Marksberry*, 3 Lit. 275; 1 Tucker, Com., 2nd Book, 337; 2 B. & A. 551; see Law of Slavery, 60; 2 Kent, 438; Shep. Touch. 227; Keyes, Chat. 263.

But there is evidence of actual delivery; McLaran, the defendant, was trustee in the deed; he admits that the property came into his possession. The instrument executed by Thurman, McLaran and his wife, on the 10th of September, 1833, all recognize the validity of the deed executed in 1831 as being binding, and as having placed the slaves beyond Thurman's control: the daughter also resided with the father, and his possession was hers. 8 Porter, 449; 1 Ala. 52; 7 Monr., and cases therein cited; and case in 7 S. & M. 804. The possession of the trustee was the possession of *cestui que trust.* 11 U. S. Dig. 244. The case of *Sewal* v. *Glidden*, 1 Ala. 52, and subsequent cases, expressly decide, that if at the time there was delivery of possession—even *in cases of parol gift*, and at time of gift the child resides with the parent, possession of father is that of the child; and the Statute of Frauds can have no application. 1 Ala. 52; 1 Bailey, 575.

It is however, said, that McLaran is a purchaser for value, and that the conveyance is void, as to him. We propose to show, first, that he is not a purchaser for value. Second, that from the position he occupied as trustee, the conveyance to him being subsequent to the deed to Lane, he was precluded from becoming a purchaser.

"A court of equity will not be deceived by a fictitious consideration in a deed; but it always inquires into the *real* state of facts, and acts accordingly." 1 Tucker, Com. 231; 4 Munf. 261; Sug. 438.

A *good* consideration is such as that of blood, natural love and

affection; but a *valuable* consideration is such as money or the like, which the law esteems an equivalent given for the grant, and is therefore founded on motives of justice.  1 Tucker, Com. 230, 239, 2nd Book.

Thus, in *Howard* v. *Armstead*, 12 Ala. 125, it was held that a promise by a father to a son, that if he will remove from North Carolina and settle in Alabama, he will give him a plantation and slaves, could not be enforced, and was a mere gratuity, although the son, by it, is induced to break up at a loss, and is put to trouble and expense in the removal.  See, also, 8 Ala. 132; 10 Johns. 246; 1 Caines, 47.

But whether or not there was a valuable consideration, his position as *trustee*, would preclude and estop him from setting up that defence, or in fact, from becoming a purchaser at all.

It is however said that he was trustee, not legally appointed, &c.

But whether he was legally appointed or not, if he came into possession of the property, with notice of the trust, or received the possession, though not legally appointed trustee, he is estopped, and becomes equally as responsible, and affected with the trust, and with the same liabilities and *disabilities*, with regard to the trust property, as though he had been legally appointed; and will be regarded as trustee, and bound to the execution of the trusts.  *Chaplin* v. *Givens*, Rice, S. C. Eq. R. 132; 1 Spear, Eq. R. 308; 3 B. Monr. L. & Eq. R. 103.

His possession is the possession of the *cestui que use*, and as against them such trustee cannot set up any claim in his own right.  3 B. Monr. 103.   Nor will he, as against *cestui que trust*, be allowed to invalidate the trust.  1 Rice, Eq. 132; 1 Ves. 522.

His presence in court, when he was appointed, was sufficient notice to affect him with the trust.  Hill, Trust. 511; 1 Vern. 124.

And being trustee, his position precluded him from acquiring any title antagonistical to the *cestui que trust;* and any act inconsistent with his duty to the rights of the *cestui que trust*, would be regarded as a distinct breach of trust.   Story's Equity, 2nd vol. 356, § 904, thus lays down the rule: "If a trustee, in violation of his trust, join in any conveyance to destroy the contingent *uses*

*or remainders,* they will be held responsible therefor; and if the persons taking such conveyance are *volunteers,* or have notice of the trust, they will be held liable to same trusts; if purchasers without notice, the trustee is responsible"—and a trustee cannot become vested with title in himself. 2 Story, Eq. §§ 1275, 1277; 2 Johns. C. R. 257; Hill, Trust. 158, 159, 279, 536.

Trustee cannot set up want of notice; if he takes by voluntary conveyance he will be bound by notice, though in fact he had none, and this equity would be enforced to the same extent when the consideration is merely nominal, or so inadequate as to amount to some fraudulent dealing. Hill, Trust. 516; 1 P. Wms. 128.

If notice of the trust existed, then the general rule is that the purchaser becomes himself the trustee, notwithstanding any consideration paid. *Murray* v. *Ballou,* 1 Johns. C. R. 457, 575; *Wilson* v. *Mason,* 1 Cranch, 100; *Argenbright* v. *Campbell,* 3 H. & M. 144; *Graves* v. *Graves,* 1 Marsh. 165; 2 Ib. 149; 1 McCord, 119.

To make the purchaser of a legal title a trustee for the *cestui que trust,* it is not necessary that he have notice of the particular *cestui que trust.* It is sufficient, if he has notice that the person from whom he buys is only a trustee. *Maples* v. *Medlin,* 1 Murph. 219.

That McLaran had full notice of the trust, is established beyond all controversy.

If Mrs. McLaran had died leaving a child or children, can any one doubt, but that under the conveyance of the 18th of October, 1831, they would have taken a remainder in fee, from the terms of the instrument? This is manifest.

Was this instrument, as a trust, binding on the donor, and could he subsequently revoke it?

There is a material distinction between a volunteer or any other, calling upon a court to enforce an executory agreement, and where the aid of the court is invoked to enforce a trust already declared by an executed instrument, as in the case at bar. If the aid of a court of equity is required to raise an interest by way of trust, on an executory agreement, you must have a valuable or meritorious consideration. *But if an actual transfer* be made, the interest

will be enforced, for the transfer constitutes the relation between the trustee and *cestui que trust,* though voluntary and without consideration. *Burn* v. *Winthrop,* 1 Johns. Ch. R. 336; Ib. 251; 3 Ib. 261; 4 Ib. 136; 10 S. & M. 397; Tucker, Com., 2nd Book, 1st vol. 231; 1 Dev. & B. Eq. R. 486; 2 Story, Eq. § 973.

The conveyance to Lane, as trustee, and the delivery of the deed, vested the title absolutely in the trustee. The instrument contains no power of revocation on its face. There is a declaration of trust in favor of complainants. The trust, so far as Thurman was concerned, was executed—nothing remained for him to do—the acceptance by Lane, divested Thurman of all title. The defendant's wife, before marriage, accepted the deed; no subsequent revocation could affect its validity. 2 Spence, Eq. 882; Atherly, Set. 96, 184; 1 Vern. 365; 1 Eq. Cas. Abr. 168; 1 Atk. 625; 2 Spence, Eq. 51, 52, 53; Ib. 882; 1 Lead. Cas. Eq. (Hare & Wal.) 225.

A deed direct to a person not *in esse,* it is true, is not valid, because delivery of the property or deed is necessary to divest title; but this doctrine does not invalidate a conveyance to a person *in esse,* in trust for persons unborn, or yet unbegotten, nor does it affect the validity of a future limitation, for their benefit, when there is a prior taker *in esse.* Thus, if a chattel personal be given by deed to A., in trust for the children of B., who has none, the trust will wait for the children; so if there be a deed of a chattel personal direct to A., for life, remainder to the children of B., the remainder will wait for their coming, if there be none *in esse.* Keyes, Chat. 45; 2 Lom. 207, 238, §§ 10, 11; 1 Shep. Touch. 255. And in 6 Mod. R. 217, it is said, if a deed be delivered to a stranger, to be delivered by him to a third person, upon his doing a certain thing, it is a deed *ab initio* in trust for the third person, on a contingency; so in 9 Gill & Johns. 79, it was held that where there was a delivery of the deed to grantee, reserving the use of property to grantor, during his lifetime, by delivery of the deed an absolute title vested in grantee. So in *Wheelright* v. *Wheelright,* 2 Mass. R. 452, it was held that love and affection for issue and *lawful heirs,* is a good consideration; and that where a deed is delivered to third a person for the benefit of grantee, to take effect upon a

future contingency, that a second conveyance by grantor, before the happening of the contingency, will not destroy the first deed. 2 Mass. R. 452; 12 Ala. R. 29; 9 Porter, R. 650; 1 S. & R. 379; 2 Lom. Dig. 21, § 22; 2 Dev. & B. 353; 6 Mod. R. 217, 18; Keyes, Chat. 45; 1 Shep. Touch. 235; 1 Ld. Raym. 311; 3 P. Wms. 222; 11 Ves. 46.

The settlement here was made, not by the husband, but by the parent; and the complainants, as heirs of the parent, are within the consideration; they do not stand in the attitude of *volunteers;* but within the range of the consideration : they are within the contract between the parent and child; the parent had a right to insist upon a provision for uncles, brothers, sisters, and other relations, and to say I will not settle, unless you so agree. Such was the opinion of Lord Eldon ; and Lord Kenyon held that very small considerations were holden sufficient to give validity to a deed, where in framing settlements, limitations are made in favor of distant branches of the family; *such remainders* are not considered as voluntary, if the object of the parties, in making the settlement, was fair and honest. 2 Vent. 162; 9 Howard, (S. C.) R. 196, 210; *Nunn* v. *Hillsmore,* 8 Term. R. 529; Atherly on Settlements, 76 ; 2 Spence, Eq. 292 ; 6 Ves. 662; 18 Ib. 38, 99.

And such will be enforced in their behalf, though subsequently born. 2 Spence, Equity, 882; 1 Vern. 298 ; 18 Ves. 101; 1 Pr. Williams, 387, 483 ; 1 Hilliard, Abridg. 367 ; Atherly on Settlements, 5.

The "*locus penitentiæ*" is gone : the *cestui que trust, though unborn* at date of transfer and trust, will acquire a *perfect title, which will not be defeated* by a *retransfer* by the *trustee* to *donor*. 2 Spence, Eq. Jur. 882, and cases there cited.

The instrument of 18th October, 1831, created an executory trust, as between the trustee and *cestui que trusts :* it was executed as to Thurman, but executory both as to the tenant for life, and ulterior limitations. Here, there was a duty imposed on the trustee : the possession of the property was to be retained by him and profits annually appropriated ; and upon the happening of the contingency upon which the ulterior limitation was to vest, he

would not be discharged until the property was delivered up : an act was to be done by the trustee, and a duty imposed. Thus, in *Garner Ex Garner*, 1 Equity, (S. C.) R. 444; 1 Dessaussure, 444, the above distinction is clearly laid down, and in that case, (similar in many respects to the one at bar,) it is held that as it was the duty of the trustee, on the termination of the life estate, to deliver up the property to the heirs : that as to them the trust was executory, though executed as to donor. See *Harley* v. *Platts*, 6 Richardson, L. R. 314.

And wherever there is a trust created which is executory, it is well settled when declared either in favor of heirs or children— the heirs take, as purchasers, and neither the rule in *Shelly's case*, nor the technical rules of common law, have any application. 1 Hare & Wallace, Leading Cases in Eq. 55, 61, 62, and cases there referred to.

The maxim *"nemo est hæres viventis,"* is invoked in behalf of defendant, and it is said that this was a limitation in effect direct to grantor, and created in him a reversion :

Did the term used, "at the death of my daughter without *living* children, *then* to *return* to *my lawful heirs*," create a reversion ?

It is settled, a reversion cannot be created by a deed : it is only raised by construction of law. 1 Greenleaf, Cruise, 342; 1 Lomax, 469 ; 4 Kent, Com. 350.

The idea is founded upon the principle, that where a party *has not* parted with his whole estate and interest in land, all that which he has not transferred remains in him, and the possession of it reverts or returns to him, on determination of the particular estate. 1 Greenleaf, Cruise, 340.

It presupposes the fact, that there is still in the grantor a remnant of the estate conveyed ; or in the language of Coke, " it is *where the residue* of an estate always doth continue in him that created the particular estate." Coke, 114 ; 4 Kent 1352.

It is a vested interest ; a fixed right of future enjoyment.

There is a material distinction between a reversion and the mere possibility of reverter : the latter is not the subject of a *transfer* or *conveyance.* 1 Lomax, 466 ; 4 Kent, 349 ; Pres. Abstracts

of Title, Book 2, p. 101, 102, 103; Ib. Book 3, p. 254; 1 Hill, (S. C.) R. 277.

In the latter case, (1 Hill,) the court, in drawing the distinction, holds the following language: "What is the possibility of reverter? —is it an estate? No, it has nothing like an estate about it; it is neither a present nor a future right, it is a mere possibility: upon the happening of a condition, the right may arise, but until then it is nothing but the mere remembrance of a condition upon which a present estate may be defeated, and a future one arise, *in any one* who may be *in esse*, and claim as heir to the donor; it is a mere right, and cannot be the subject of *grant, devise,* or *inheritance,* nor *surrender,* nor *merger.* It cannot be any thing with which an estate can unite: it is a mere floating right of possibility. *Adam s* v. *Chaplin,* 1 Hill, S. C. R. 278, 279; 13 Wend. 221.

If, in a common law gift, the donor limit the fee in contingency, he will not have a *reversion,* but possibility of reverter. 1 Lomax, 469; 4 Kent, 349; 1 Pres. Abstracts of Title, 83.

There is no reversion after a contingent remainder in fee. Lomax, page 466, lays down the following doctrine; "that so long as the contingent remainder in fee *is capable of effect,* the grantor has no reversion; and no case can be shown where the conveyance of such an interest has been held valid. Lomax, 466; Pres. Abstracts of Title, Book 3, p. 254.

So, Preston on Estates, page 115, lays down the following rule: "As often as a disposition of the fee is made by a conveyance at common law, and by the limitation of the legal estate, either *absolutely* or on contingency, there is no reversion in the person from whom the grant proceeds.

By the instrument, a life estate was conveyed in the profits to the daughter Eliza, with a remainder in fee to her children living at the time of her death; if she died without child or children, then a remainder to the then lawful heirs of donor. Here were two remainders, the one a substitute for the former. That remainders may be thus created and limited, the one as a substitute for the other, is well settled. 4 Dane, Abridgment, 796; 1 Lomax, 466, 469; 1 Lord Raymond, 208; 2 Ves. 610; 4 Kent, 201; 1 Tucker, Com. 143.

We think it clear, that Thurman had no reversion in the slaves by construction of law. First, Because the whole estate passed to the trustee. Second, A good remainder in fee was created, and there is no such thing as a reversion after a remainder in fee. 1 Lomax, 469; 4 Kent, 349; 1 Lomax, 466; 1 Preston, Ab. Title, 83; Ib. Book 3, p. 254; Preston on Estates, 115. Third, The fee was limited in contingency to the children of Mrs. McLaran. Fourth, By the conveyance executed, he parted with his whole interest. Fifth, It was only in the event of no child living at death of Mrs. McLaran, that the limitation was to the then *lawful heirs of donor.*

In a conveyance to uses, a man may make heirs of his body *purchasers* by that name, since he alters the quality of the estate to which those heirs in general would be entitled by descent. 1 Preston on Estates, 455, § 299; 1 Pr. Williams, 387.

In *Pease* v. *Keller,* McMullen, Equity (S. C.) R. 231, it was held, that where an estate of freehold is given with a remainder or reversion to right heirs of donor, he will take, who answers that description at the termination of the life estate. So in 2 Dev. & Battle, Eq. R. 353, 357, it was held, that under provision "return to old stock," those who were heirs, were entitled, &c. See 23 Ala. 503; 1 Strobh. (S. C.) R. 130; McMullen Eq. (S. C.) R. 231; 2 Dev. & Bat. Eq. R. 353; 1 Stewart, Ala. R. 540; *Thomas* v. *Wallace,* 5 Ala. 275; and particularly *Price* v. *Telly, Adm'x.,* 10 Ib. 950; *Williamson and Wife* v. *Mason,* 23 Ib. 503; 21 Ib. 464; 8 Ib. 352; 2 Story, Eq. 231, §§ 1065, 1071; 2 Spence, Eq. 154; 1 Lord Raymond, 311; 1 Serg. & Rawle, 379.

Heirs, as such, may take as purchasers by that general name, "personal property," because "heirs" in such a conveyance is not to receive a technical meaning. 1 Swan, R. 496; *Holeman* v. *Fort,* 3 Strobh. Eq. R.; 4 Dana, R. 53; 4 Mason, R. 485; 7 Cranch, 456; 4 Kent, 213.

The Alabama statute provides, that any person may make a conveyance or devise of lands to a succession of donees then living and the heir or heirs of the remainder mentioned, and on default thereof, to the right heirs of donor in fee simple. Aikin's Digest, 94, § 39.

Harris et al. *v.* McLaran.

The word remainder, is no term of art, nor is it necessary to create a remainder; any other word showing the intent, sufficient, as "*revert, return, go, belong.*" 1 Greenl. Cruise, 2nd Book, p. 227, § 7; Dudley, (S. C.) R. 71, 81; 9 Hill, (S. C.) R. 543.

There is a difference between a limitation to heirs of a person who is living, and one who is dead, where a limitation is by deed and by will. Where limitation is to heirs by will, testator being dead, those who are heirs at his death, will take; but when by deed, and grantor is living, those who are his heirs at time of contingency, upon which the estate is to vest, will take.

Now, let us examine the leading authorities relied on by defendant, as creating an estate or reversion in grantor.

In 1 Bacon, vol. 4, p. 298, it is laid down that, as a *general* rule, no one can make his own right heirs purchasers either of fee simple or fee tail, *without* parting with the whole estate; and the reason was, the prejudice that might otherwise arise to the lord in respect of his seigniory. That if a man makes a lease for life, or gift in tail to himself or his own right heirs, the remainder would be void, because the fee still continued in him, and he could not give himself that which he had before; and he could not give his heirs, as such, that which the law gives them by a prior right. So in Cruise, 336: If a man makes a gift in tail, or lease for life, remainder to his own right heirs, the remainder is void, and he has the reversion in him; so, if a man makes'a feoffment in fee to the use of himself for life, and after, to the use of another in tail, and after, to the use of his own right heirs, the reversion is in him by construction of law, and not by the limitation; for the use of the fee continued in him, and the statute of *uses executes* in him the possession to the use in the same plight, the use was limited. But Preston on Estates, 117, and 11 Mod. 181, hold a different doctrine. The above cited cases are the strongest that can be found in favor of the idea of a reversion in the donor. But let us examine them; and we think they are not applicable to the case at bar.

The first, where no feoffment is made, is the effect of the statute *de donis.* 4 Kent, 349. A reversion, as an estate, is the creature of this statute; before this statute, there was no such

thing as a reversion, but simply the right of reverter. The statute *de donis*, has no application to personal property. 2 Story, Eq. 251, § 988.

The reason assigned in the first case is, because the fee was still in the donor, and had never passed out; and he could not give himself that which he had before. Second; he could not give his heirs, as such, that which the law gives them by a prior right. Now, it will be remarked, that in *none* of these cases was the limitation *after* a contingent remainder in fee. 1 Lom. 469; 4 Kent, 349; 1 Preston, Abr. Title, 83. Third; the limitation to his lawful heirs, was after the limitation in fee to the children of Mrs. McLaran. Fourth; the lawful heirs at the time of the death of Mrs. McLaran, would take a different estate under conveyance, from that which they would have taken as heirs; as will be noticed hereafter.

The second case is under the Statute of Uses, as where it is said, if a man makes a feoffment in fee, to the use of himself for life, and after to the use of another in tail, and after to the use of his own right heirs, the reversion is in him by construction of law, because the use of the fee was in him, and the Statute of Uses executed the possession to the use. Cruise, 342.

It will be noticed in the latter case, the fee or legal title passes out of the grantor. We will examine under the rule as laid down, whether Thurman could acquire a reversion under the words, "to *return* to his lawful heirs," or whether there was such a use as the statute would execute. The language of the instrument is, "then and in *that case to return* to my lawful heirs," that is, if the contingent remainder in fee to the children of his daughter should fail.

Prior to the statute of 27 Henry, known as the Statute of Uses, a use was neither "*a jus ad rem*" nor "*a jus in re*," but simply a right to the profits. 1 Cruise, 281.

The reason why the *cestui que use* had no property whatever in the land, by common law, prior to the statute executing the use, was, because the use derived its effect from the declaration of the grantor, whereas no legal right to an estate, could be transferred, except by livery of seisin. 1 Cruise, 337.

An' use, not being an estate in land, was not a subject of tenure. The statute of 27 Henry, was passed to destroy them, by passing the possession to the use, though after its passage there were uses to which the statute did not apply, which were supported and taken notice of by the Court of Chancery, under the name of *trusts.* 1 Cruise, 333; 1 H. Black. R. 136.

Under this statute, three things were necessary to the execution of the use. First, a person seised to the use of another. Second, a *cestui que use in esse.* Third, a use in possession, remainder, or reversion. 1 Cruise, 304.

At what time could the statute have applied, from the execution of the conveyance, to the happening of the contingency—the death of Mrs. McLaran without children?

Suppose Lane, the trustee, had nothing but the bare legal title; if the statute applied, it is true it would have transferred the possession to Mrs. McLaran for life.

But at what time during the life of Thurman, the donor, did Thurman or his heirs have any use in the property conveyed, upon which the statute could operate? The use in remainder, or the remainder in fee, was limited to a party not *in esse;* the child of the daughter; and to the daughter during her life, and at death of the daughter, without living children, "then and in that case to *return to lawful* heirs" of donor. It is not the right to a use which the statute transfers the possession and title of, but the right in a use. 4 Kent, 235.

The use cannot be executed, when the person is not *in esse;* there must be a person seised, and a use *in esse,* or there cannot be an execution of the possession to the use. Thurman, the donor, died before the happening of the contingency, upon which the remainder in fee was to vest; and at *no time* after the execution of the instrument, during his life, had he a right in the use—no use was created for him or his heirs, at the creation of instrument, except as an alternative remainder, depending upon a contingency, which did not happen until after his death. It is settled, that the law will never, by implication, create a use to donor when a different use is expressed in the instrument.

We have endeavored to show, that neither from the principles

deduced from statute of 27 Henry, or statute *de donis*, upon which the cases referred to are founded, could the limitation in the deed to Lane create a reversion in Thurman.

The cases relied on by defendant have *no application* to the case at bar, for the whole of these subtleties and refinements as to reversions have their origin in the statute " *de donis*," and 27 Henry, neither of which are in force, either in this state or Alabama. 13 S. & M. 149.

In Alabama, Virginia, and this state, a partial substitute for the Statute of Uses has been adopted. H. & H. 349 ; 1 Cruise, 302.

On an exact copy of the Alabama and Mississippi statute, Judge Lomax says : " to give this act a meaning co-extensive with the English statute, so as to include every case where there may be found a seisin in one person and a use in another, seems to be unwarranted by any rule of statutory construction, nor is there any principle of policy so imperious as to require so free a construction of plain and unambiguous language. 1 Cruise, 302 ; 1 Lomax, 188, 189 ; 4 Kent, 300.

This conveyance is not within the statute ; neither the Alabama nor Mississippi act, would have ever operated so as to have transferred a title or possession to Thurman.

In *Bass* v. *Scott*, 2 Leigh, 359, the court held that there is no general statute of uses in that state.

In all cases not provided for in the act, *uses are* to be regarded as unexecuted, as they were prior to 27th Henry. *If unexecuted,* or not embraced by the statute, the uses remain as *equitable* estates, of the same nature as trusts. 1 Lomax, 188, 189 ; 1 Cruise, 303.

Personal property never was within the meaning or spirit of the Statutes of Uses. 1 Richardson, (S. C.) R. 168 ; 1 Spear, Eq. 580 ; Walker, American Common Law, 290.

There is no reversion to personal property. Ib. *Nice* v. *Burnett*, 1 Spear, Equity, 580.

Whenever personal property is limited, as it may be in this country, it is what a use was, unexecuted by the statute—a trust. Trusts now, are what uses were, before the Statute of Uses. 4

Kent, 297. They are deemed capable of the same limitations as legal estates. There is no difference between the modern trust and the ancient use; though a wide difference in the application of those principles. 1 W. Blackstone, R. 80.

Kent, in citing this case says : " the difference consists in a more guarded care against abuse; the *cestui que use,* is regarded as seised of the freehold, in contemplation of equity. The trust is regarded as the land, and the declaration of trust as the disposition of the land."

The court takes a wider range, a more liberal view, and looks to the intention of the parties. 4 Kent, 298. An assignment of an interest, in trust, will carry a fee, 4 Johns. R.; and no technical words or expression is necessary to carry the legal estate. 4 Kent, 298.

Thus, on a feoffment to A. and his heirs, to the use of B. and his heirs, in trust for C. and his heirs, it was held, that the statute executed only the first use, and that the second use was a mere nullity; but as it is evident that B. was not intended to be benefited by that conveyance, the Court of Chancery took cognizance of the case, and decreed that B. should pay the rents and profits to E., and execute such conveyance as he should direct. 1 Cruise, 341; 2 Blackstone, Com. 336.

We therefore think it clear, that under the clause, " *then to return to my lawful heirs,*" there was no reversion created in the grantor Thurman.

The bill of sale, therefore, to McLaran and wife, did not convey to them any title. It could not operate as a merger of the life estate; if the conveyance had been valid, though made direct to McLaran and wife, she being a *feme covert,* its legal effect would have been the same as if directed to McLaran alone; a deed direct to a married woman, would have vested title in the husband; it conveyed no interest to the wife ; her interest, an estate for life, as her separate property, secured by the deed of 1831, could not thus be destroyed; if so, in effect the position assumed would be, that where a married woman has a separate estate for life, conveyed by a parent, who retains either a reversion or possibility of reverter in himself, that by a transfer of the reversion or possibility of

reverter, to the husband, the wife's separate estate is destroyed, and the husband takes the whole estate.

There could be no merger.   1 Lomax, 452, 453 ; 2 Bouvier, L. Dic. 143 ; 2 Ath. 592.

The instrument signed by Thurman, McLaran and wife, on 10th September, 1833, *could* not destroy the deed of 18th October, 1831, either by way of surrender or otherwise.   A surrender can only be made by tenant for life, having legal title.   1 Dev. & Battle, Eq. R. 486 ; 23 Ala. 611, 503.

It was not* acknowledged, as required by law ; no separate acknowledgment was taken ; she was then a *feme covert*.   The defendant, her husband, was trustee : he admits his avowed object was, to destroy the deed of 18th October, 1831 : *this he could not do.*

The act of Ala. (Aikin's Digest,) prevents the destruction of the estate in remainder.   There were other interests besides that of the life estate, secured by the instrument.   A trust had been declared in favor of complainant—no power of revocation was contained in it.   It was irrevocable, and could not thus be defeated. If the conveyance of 10th September, 1831, had been executed in due form of law, and the life estate reconveyed to grantor, it would not have operated as a destruction of the ulterior limitations.   A freehold estate in Alabama may be made to commence in future. No particular estate is required to support a remainder.   The *trustee* could not thus defeat the remainders, even if regarded as contingent.   23 Ala. R. 611.

To constitute a surrender, the following prerequisities are laid down as being necessary.

First, That the surrenderor have an estate in possession of the thing surrendered.   Second, The surrender must be to him that hath the next immediate estate in remainder or reversion, and that there be no intervenient estate coming between.   Third, A privity of estate between the surrenderor and surrenderee.   Fourth, That the surrenderee hath a higher and greater estate in the thing surrendered than the surrenderor hath, so that the estate of the surrenderor may be drowned therein.   Fifth, That he hath an estate, in his own right, and not in the right of his wife.   Infants, *feme coverts,*

and such like, are disabled to make a surrender. Sheppard, Touch. 303.

If we are correct in the position, that there was no reversion in Thurman, but simply the possibility of a reverter, there can be no question that neither the conveyance to him, nor the subsequent conveyance, direct to McLaran and wife, were of any binding efficacy, or affected the validity or provisions of the conveyance of the 18th October, 1831. See *Jackson* v. *Waldron*, 13 Wend. 220; Preston, Abs. Title, 204, 205; 1 Hill, S. C. R. 207.

But, if true, as asserted by answer of McLaran, that he was never trustee, then if the instrument was not acknowledged by his wife, as required by law, there is an end of the question; or if properly acknowledged, the legal title being in Lane, who did accept the trust, she not having the legal title by any transfer of his, could not defeat the ulterior limitations; for, by the terms, she was simply entitled to the profits annually, and the title was in Lane, who never did convey. Not having the *legal estate*, she could not destroy the limitations. Fearne, on Rem. 321, 422; 1 Dev. & Battle, Eq. R. 486.

It is assumed, however, that there was a reversion in the parent, and that by his death, this descended to the daughter, and her life estate became thereby merged; in other words, in effect, her separate estate was destroyed by the death of her parent, and the husband became, by virtue of his marital rights, entitled to the whole property.

In *McGruder* v. *Stewart*, 4 How. Miss. 212, it is held, that a life estate is not enlarged, when by possibility the remainder may take effect; and in this very case, in our own court, it was held that, notwithstanding the tenant for life was heir, that her title was not thereby "changed," &c.; that the husband was not entitled, by virtue of his marital rights, to that property which the wife would have been entitled to in the estate of her father, in the absence of the estate for life. 4 How. Miss. R. 212. And in the case of *Plunket* v. *Holmes*, 1 Lev. 11; Ld. Raym. 28, it was resolved that the descent of the fee on the tenant for life, did not destroy the contingent remainder. The case was this: "One devised lands to T., his eldest son, for life, and if T. should die without issue

living at his death, then to L., another of testator's sons, in fee; but if T. should have issue living at his death, then to the right heirs of T., forever. The testator died, and it was resolved that T. was tenant for life (because the limitation over, was not upon dying without issue generally,) but was confined to a dying without issue then living, with the remainder in fee, in contingency, and that the *descent* of the fee upon him as heir, at the death of his father, did not destroy the contingent remainder; so in case of *Boothby* v. *Vernon,* (9 Mod. 147,) it was taken for granted that the contingency was not destroyed by the descent of the fee, and that the descent of the fee did not destroy the contingency nor merge the life estate. It was further held in the case of *Plunket* v. *Holmes,* that the tenant for life, though heir, was viewed as a stranger; and though the reversion descended, yet not so absolutely as to merge the life estate. The distinction which runs through the cases is this: if the reversion descends from the person creating the life estate, and there are ulterior limitations, there is no merger: but it is otherwise when the tenant for life becomes possessed of the reversion from a different source. 1 Lev. 11; Raym. 28; Fearne, Rem. 342.

We have thus endeavored to show:—

1. That the deed of 18th October, 1831, was valid.

2. That a trust was declared in favor of complainants, which ought to be enforced, and that under the limitation *they* are entitled.

3. That the defendant, from his position as trustee, could by *no act defeat* the deed; that he was not a purchaser, and could not be, having come in possession of the property with notice of the trust.

4. That the instrument by which it was attempted to reconvey the property to the grantor, was a nullity, as well as the conveyance to defendant and wife.

5. That by the limitation, at death of daughter without child, living issue, "then and in that case, to return to my lawful heirs," no reversion was created.

6. That there was no merger, surrender, or discontinuance of

the ulterior limitations; but that they are valid, and complainants are entitled under the same.

7. That the wife of defendant never had any other than a life estate, which ceased at her death, and therefore the defendant *is not* entitled by virtue of his *marital rights.*

If, however, the court should be of opinion that under the deed of 18th of October, 1831, the complainants are not entitled, either as purchasers, or by virtue of any trust; and that the limitation, "then to return to lawful heirs," created no estate or interest in complainants, yet it might well be questioned, whether, under the "doctrine of *shifting or springing uses,* the complainants would not be entitled. But if the limitation in the deed as to complainants, be void, yet at the death of wife of defendant, *they,* by the proof, were the heirs of Thurman; *this is not disputed.* Then, if it be true that the wife of defendant had *but a life* estate, under the allegations in the bill and general prayer, *they, as heirs, would be entitled to the slaves in controversy.* Defendant stands not in the attitude of heir to Thurman; *there is nothing* to which his *marital* rights could attach; and a court of equity would entertain jurisdiction and decree the delivery of the slaves; especially when the administrator of Thurman (the defendant,) is in possession of them, claiming title. Defendant, as such, would occupy the attitude of trustee for complainants, 4 How. Miss. R. 204, 455; *Farve* v. *Graves,* 4. S. & M. 707; and when a probate court would have no jurisdiction to try a question of title.

Nor could the defendant avail himself of the Statute of Limitations. First, Because many of complainants are infants. Second, A trust is not within the statute. Third, The right of action must first accrue before the statute commences running. That as against those in remainder or reversion, it never commences running until the termination of life estate. *McGruder* v. *Stewart,* 4 How. 204; 2 B. Monr. Law & Eq. 428; *Hendricks* v. *Robinson,* 7 Dana, 165.

Complainant's right of action did not accrue until the death of Mrs. McLaran, (defendant's wife,) which was in 1851—and the bill was filed in 1852—and it was only then that the heirs of Thurman were entitled: nor was the widow of Thurman (Mrs. Haden,)

a necessary party to the bill, for she has no interest. She would only be entitled to a dower interest in that property of which her husband was possessed at the time of his death. 13 Ala. 656; 6 Ib. 874; 10 S. & M. 397; Aikin, Dig. 132, 133.

She has no interest in that, in remainder or reversion. Chilton, Prob. 413; 1 Pick. R. 157; 4 Dane, Abridg. 664, § 4; 8 Humph. 713; 1 Hil. Abridg. 64, §§ 42, 48, 49; 9 U. S. Dig. 147; 4 Ib. 593.

*Harrison* and *Matthews*, on same side, filed an elaborate printed brief.

*D. C. Glenn*, on same side, argued the cause orally, and filed an elaborate brief.

*James T. Harrison*, for appellee.

1. It is a positive rule of law, that a man cannot raise a *fee simple* to his own right heirs, by any form of conveyance whatsoever. Where an ultimate remainder is to a person's own right heirs, instead of giving a contingent remainder to the heirs, the effect is to leave the reversion in fee in the grantor. The reversion is in him by construction of law, and not by the limitation. And, indeed, it is the natural sense and use of the word heirs, thus employed; for, as I cannot have heirs during my life, (since who is to be my heir, cannot be known till I die,) the term heirs, thus used, does not naturally designate any person, as the taker of the estate. *Godolphin* v. *Abingdon*, 2 Atk. 56, 57; *Cholmondley* v. *Maxcy*, 12 East, 589; *Pybus* v. *Mitford*, 1 Mod. 120, 122; 1 Hil. Abr. 199, § 28; 367, § 31; 419, § 8; 1 Tucker, Com. 135, 138, 139, 140; Fearne, Rem. 49, 50, 51, 52, 66; 1 Preston, Est. 290, 291; 2 Ib. 37; 2 Thomas, Coke, 116 note, 464 note; Watk. Descent, 121, 168, 259, 280; Watk. Convey. 60, 120, 121.

There are three exceptions to the fourth sort of contingent remainders:—

The first arises out of the rule in *Shelly's case.* The second arises from the principle heretofore adverted to, that an ultimate limitation to the right heirs of *the grantor*, will continue in him

as his old reversion, and not as a remainder, *although the freehold be expressly limited away from him.*

The third exception arises from the respect which the law pays to the intent of the testator, where it can be plainly collected from his will that he used the word heir as *descriptio personæ.* 1 Hil. Ab. 367, §§ 28, 29, 30, 31; 1 Lom. Dig. 413, 414, §§ 8, 9, 10, 11; 2 Cruise, Dig. Title, 16, Remainder, ch. i. §§ 32, 33, &c.; Preston, Abr. Title, 432; 2 Thomas, Coke, 105, note.

But the title to *chattels personal,* was held by the ancient common law to be indivisible into successive interests, and a remainder could not be limited after a life estate. The transfer of a chattel to A. for life, or even for a moment, passed, therefore, the title to him for ever. But the courts have modified the general principle. Keyes, Chat. 12, 13, 14; 11 Leigh, 413; 2 Kent, 352; 2 Black. Com. 398; *Price* v. *Price,* 5 Ala. 581.

Yet, still, chattels personal are not subject to all the modifications of title that real property is. One exception is, that an estate tail cannot be created in such property; for it is well settled that the limitation of personal property, by words which would create an estate tail, if applied to lands, will leave the effect to vest *the absolute title in the first taker. Price et al.* v. *Price,* 5 Ala. R. 581, 582; *Darden's Adm'r* v. *Burn's Adm'r,* 6 Ib. 362; *Scott et al.* v. *Abercrombie et al.,* 14 Ib. 275; 15 Ib. 669; 1 Tuck. Com. 135, 139; Keyes, Chat. 32, § 24.

And another exception is, that an interest similar to a *fee conditional, cannot be created in chattels personal;* and the reason is, that anciently a gift of chattels personal to a person, was an absolute gift; the word "heirs," or "heirs of the body," or "executors," or "administrators," *had no effect whatever on the quantity of interest;* nor was the quantity of interest affected by the use of restrictive expressions, as for life or for years. And when the courts departed from the ancient doctrine, and allowed partial interests to be created, they could not allow that "heirs of the body" was a restriction upon a gift which was, and still is, an absolute gift in all cases, unless it be restricted; because, as chattels personal do not descend, heirs of the body could not take; and

therefore the words are *simply nugatory.* Keyes, Chat. 32, § 25; 2 Chitty, Black. Com. 113, note.

The legal doctrine was once held, that if a chattel personal was assigned to a person for life, the law knew nothing of a *reversion* remaining in the assignor, because chattels were essentially the subject of absolute ownership, and the tenant for life at once *became entitled to the whole.* Wms. Personal Prop. 186, 188, 192, 193.

. · But courts of law and courts of equity are bound to recognize *quasi* reversions, to the extent that they acknowledge the existence of partial interests. Keyes, Chat. 217, § 275; 216, § 274.

A reversionary interest in chattels personal, like a reversion, cannot be created, but arises by mere operation of law, and like a reversion, it is also an interest that is to return into possession upon the expiration of a prior interest; but it differs in other respects from a reversion, and it is therefore properly called a *quasi* reversion. Keyes, Chat. 214, § 267.

And a remainder in personal chattels, is like a similar interest in real property, in this, that they are both limited to take effect upon the regular expiration of a prior interest, but they differ in other respects. Keyes, Chat. 214, § 268.

*Quasi* reversions cannot, of course, depend upon estates tail, or upon *quasi* fees conditional, because such estates cannot exist in chattels. Nor can a possibility of reverter exist after a gift of chattels, which, in the case of real property, would be a fee conditional, because the absolute property is held to pass by such a gift. Keyes, Chat. 223, § 283.

Conditional limitations and possibilities of reverter in personal chattels, are interests precisely of the same character. Keyes, Chat. 224, § 286. ·

And a limitation of personal property cannot be made to take effect after the expiration of an *absolute* interest, whether absolute expressly or by implication. Keyes, Chat. 146, § 198.

And it may safely be asserted, that *quasi* reversions of personal chattels exist in all cases, both at law and in equity, in which partial interests alone are created in them; and in all cases in which partial interests are created with limitations over, which

may fail to take effect, or which *are void ab initio,* or which subsequently become void. Keyes, Chat. 217, § 276, p. 219, 249; *Lenoir* v. *Sylvester,* 1 Bailey, Law R. 643, 644; *Geiger* v. *Brown,* 4 McCord, 427; *Hill and Wife* v. *Hill and Bates,* Dudley, Eq. R. 76; *Greene* v. *Ward,* 1 Russ. 262; 1 Eng. Ch. R. 262; *Andree* v. *Ward,* 1 Russ. 260; 1 Eng. Ch. R. 260; 2 Strobh. Eq. R. 359; *Young's Adm'r* v. *Snell,* 4 B. Monr. 221; 1 Dev. & Bat. 334; *Price* v. *Telly's Adm'r,* 10 Ala. 950; *Vannerson* v. *Culbertson,* 10 S. & M. 150.

It is said to be a rule, that where the donor of a chattel manifests an intention to part with the *whole interest,* if the limitation over is either originally void, or incapable of vesting when the contingency happens, the whole interest vests in the first taker. *Powell* v. *Brown,* 1 Bailey, Law R. 100; Keyes, Chat. 222, § 281; *Lenoir* v. *Sylvester,* 1 Bailey, Law R. 643, 644.

But this rule does not apply, except to cases in which conditional limitations are engrafted upon interests in the first taker, which in the absence of the conditional limitations, would be held to be absolute interests. Thus, if there be a gift to A., and if he die without leaving issue, then to B., and A. die leaving issue, the property does not revert, for the *general gift* to A. passed the *whole* property, and the limitation to B. was a conditional limitation engrafted upon it, by the failure of which, the limitation to A. became absolute. But if there had been a gift to A. for life, and if he die without leaving issue, then to B., and A. die leaving issue, then the property reverts to the donor, or his representatives, for the gift to A. is but for life. It is not enlarged by construction; the issue cannot take by representation, nor can they take by purchase; B. cannot take, because the event on which he was to take did not happen; therefore, the remainder of the property is undisposed of, and consequently reverts. Keyes, Chat. 222, § 281; *Green* v. *Ward,* 1 Russ. 262; 1 Eng. Ch. R. 262, 264; *Andree* v. *Ward,* 1 Russ. 260; 1 Eng. Ch. R. 260.

It is not sufficient, therefore, to destroy the *quasi* reversion, or possibility of reverter, that an intention to dispose of the whole interest should appear; but there must be a *valid and effectual disposition,* otherwise, the *quasi* reversion or possibility of reverter

will exist. The case of *Powell* v. *Brown,* (in which the first taker was decided to be entitled to the whole interest,) is not inconsistent with what has been asserted, for that was a case of a *conditional limitation engrafted upon an absolute interest.* In that case, there was a gift of slaves to Nancy Powell, to have and to hold the same to her and her issue forever, and it was declared to be the nature of the deed, that if she should die without issue, the said slaves should return at her decease to the "surviving heirs of the donor." She died without issue in the *lifetime of the donor,* and it was held that the negroes did not revert to the grantor, and that the idea that he could take under the limitation to his own heirs in his own deed was preposterous. Had the limitation, however, to Nancy Powell been for life, then, notwithstanding a limitation over to the "heirs" of the grantor, the *quasi* reversion would have *continued in him, precisely as if no limitation to his heirs had been made.* Had Nancy Powell died in his lifetime, he *or his assignee* would have been entitled to the property, not by virtue of the limitation in the deed, but by virtue of the *quasi* reversion. Had Nancy Powell outlived him, and he had *left the quasi reversion undisposed of,* then, "his heirs" would have taken, not *by virtue of the deed,* but by virtue of their title as distributees. Keyes, Chat. 223, § 282.

Heirs, as heirs, have nothing to do with chattels personal. They pass to the administrator as assets for the payment of debts, yet the rule of the common law as applied to devises of real estate, is applied to gifts of chattels personal. The principle extends to " next of kin," " distributees," "legatees" and other gifts, which by construction are to the next of kin. Keyes, Chat. 46, 47, § 59.

So, if a man convey to B. for life, remainder to his own executors, the limitation over is void, unless it appear that it was intended for the executors personally, and not in their representative capacity. Keyes, Chat. 230, § 300.

A *quasi* remainder must be limited to one who can take it by purchase. Thus, if A. by deed convey a chattel to B., for the lifetime of A., remainder to the "next of kin," "the distributees,' ' or " the relations" of A., the *quasi* reversion is in A., and upon his

death, the property passes by representation, and not by purchase. Keyes, Chat. 230, § 300.

And if A. bequeaths his personal property to those who are entitled under the statute of distributions generally, and not specially, they take by representation, and not by purchase, and not under the testament. And so it is, if there is a gift of a future· *vested interest,* and there is no *effective provision preventing the vesting of the residue.* Keyes, Chat. 266, § 364.

And if A. bequeath a chattel to B. for life, remainder to C. for life, and make no further disposition of the chattel, and C. is *sole distributee,* C. will take the *whole* interest after the death of B. *by virtue of his title as distributee.* And, so indeed, would he have done, had the whole interest, after the death of B., been limited by A. to his "next of kin," for the title by law is higher than the title by limitation. Keyes, Chat. 230, § 301; 46, § 59; 265, § 365; 271, § 364.

In *M'Gendee & Nichols* v. *Stewart's Adm'rs,* 4 How. Miss. R. 205, the court seem to have gotten among the doctrines of merger and remainder, and thus to have overlooked the principle of the case. Keyes, Chat. 265, § 365.

It was held in that case, that the daughter of the testator did not become the *absolute owner* of the negroes, but took a life estate ; that a remainder *vested in interest in her children ;* but that if she happened to outlive *her children, she would hold the negroes absolutely,* "because of the failure of other heirs."

If there be a gift of a chattel personal to A. for life, and if A. should have a son living at the time of his death, then to that son; A. will take an interest for life, and if he have a son living at his death, that son will take; but if he have no son at that time, the chattel will revert; and *until that time* the reversionary interest *will continue in the donor or his representatives.* Keyes, Chat. 219, § 279 ; 249, § 346.

A testator gives a residue to A. for life, remainder to B. for life, *then,* to be divided among his (the testator's) "relations;" this is a mere intestacy, and goes to the relations at the death of the testator. *Masters* v. *Hooper,* 4 Brown, Ch. R. 207.

In *Lowndes* v. *Stone,* 4 Ves. 649, 651, the testator gave the

residue of his effects to his next of kin or heir at law, and the court ordered distribution to be made according to the statute. The bequest therefore was held to be *void.* Keyes, Chat. 60, § 84.

In *Holloway* v. *Holloway,* 5 Ves. 399, the testator bequeathed £5000, *in trust* for his *daughter* A. *for life,* and *after* her decease to such *child* or children as she should leave *at her decease,* in such shares as she should think proper; and in *case she should die leaving no child, then,* as to £1000, part of said £5000, in trust for the executors, administrators or assigns of the daughter; and as for the £4000 remaining, in trust for such person or persons, "as shall be my heir or heirs at law," that is, of the testator. Held, that the £4000 *vested in* A. *and the two other daughters of the testator,* being co-heiresses at law, and next of kin *at his death.*

In that case the master of the rolls said; "if an estate for life was devised to one, and *after his death* to the right heirs of the testator, it never would be held, that though the tenant for life was one of the heirs, that would reduce him to an estate for life, but he would *take a fee.*" And in *Doe* v. *Lawson and others,* 3 East, 290, it is said by the court; "I see no inconsistency in that, at least not sufficient to get rid of the plain meaning of the words." And see *Masters* v. *Hooper,* 4 Brown, Ch. R. 207; *Powell* v. *Brown,* 1 Bailey, 100; Keyes, Chat. 230, § 301; 223, § 282.

And although a testator has limited a fee to his right heirs *after* several particular estates, it shall be a gift to his right heirs *ascertainable at his death,* and as such void. 2 Preston, Est. 37; 2 Preston, Abr. Titles, 83; *Godolphin* v. *Abingdon,* 2 Atk. 56, 57; *Cholmondley* v. *Maxcy,* 12 East, 589; Keyes, Chat. 230, § 300; 46, § 59; 223, § 282; 266, § 364; 230, § 301.

In *Eddings* v. *Long,* 10 Alabama, Rep. 203, the court say, that when the term "heir" is used in connection with personal estate only, there is no conflict in the cases; that it is to receive the same construction as next of kin, citing *Lowndes* v. *Stone,* 4 Ves. 649; *Holloway* v. *Holloway,* 5 Ib. 399; *Vaux* v. *Henderson,* 1 S. & M. 388. This term (legal heirs,) used solely in this connection, seems to be precisely equivalent to legal representatives, and the decisions are numerous where this is held

to mean next of kin; and these' take under the will, as under the statute of distributions, citing *Bridge* v. *Abbott*, 3 Brown, Ch. R. 64; *Long* v. *Blackall*, 3 Ves. 486; *Cotton* v. *Cotton*, 2 Beaven, 67; Keyes, Chat. 74, § 101; 75, § 101.

In the case before the court, the complainants claim as the children and children's children of John Thurman's, (the donor's,) brothers and sisters, and contend that they answer the description of "lawful heirs," contained in the ultimate limitation in the deed, and that they were his, the grantor's, next of kin, at the time of his daughter's death. The deed was executed in Alabama, in 1831; the defendant intermarried with the daughter in 1832; Thurman died in 1840, and the daughter in 1850, without leaving living issue.

If the ultimate limitation in the donor's own deed, in favor of his lawful heirs, is *void*, that settles the case.

On the 25th September, 1833, John Thurman, by his deed of that date, conveyed the property' absolutely, and delivered the possession of it to the defendant and his wife, with a covenant of warranty against his heirs.

If no reversion remained in the donor, or *quasi* reversion, as it is termed, then the first taker took the *absolute title*, (and not a mere life estate,) to which the marital rights of the husband attached. This would equally defeat complainants. They do not claim as the daughter's next of kin, or under her. If the donor parted with the whole interest, it does not avail them, unless there is a valid and effectual limitation in their favor. And at the time of his death, they were not "his lawful heirs."

And the interposition of a trust estate, (if one had been interposed,) to preserve contingent remainders, between the estate for life and the limitation to the heirs, or for the separate use of a woman, will not prevent the remainder or ultimate limitation from failing to take effect. The rule is applicable to all sorts of instruments by which such gifts and limitations can be made, either at law or in equity. 2 Jarm. on Wills, 244, 246, 251, 252, 253; *Godolphin* v. *Abingdon*, 2 Atk. 56, 57; 2 Ib. 247, 248, 250; *Cholmondely* v. *Maxcy*, 12 East, 589, 601; *Holloway* v. *Holloway*, 5 Ves. 399; Roberts on Frauds and Fraudulent Contracts, 175, 176; *Scott et al.* v. *Abercrombie et al.*, 14 Alabama, 270, 276;

*Lenoir* v. *Rainey*, 15 Ala. 667, 670 ; *Ewing* v. *Standefer et al.,* 18 Ib. 404; *Lamb, Trustee, &c.* v. *Wragg et al.,* 8 Porter, 73, 79; *Cook* v. *Fennerly and Smith,* 12 Alabama, 42 ; *Powell* v. *Brandon,* 24 Miss. R. 362 ; 2 Strange, 1125 ; Doug. 337 ; Ambler, 334 ; 5 Barn & Ald. 510 ; Hayes on Estates Tail, 17, 18, 23 ; 1 Preston, Est. 288, 290, 381, 388, 392 ; 1 Fearne, on Rem. 57, 58, 59, and note, 79, 490 ; 1 Preston, Abr. Title, 144; 2 Ib. 432, 433; 2 Thomas, Coke, 120, note; Ambler, 376, 377 ; 3. Bos. & Pull. 627 ; 2 Lord Raymond, 873, 878 ; 5 Durnf. & East, 290 ; 2 Pr. Williams, 471, 478 ; 1 Brown, Ch. R. 222, 223 ; 2 Vernon, 430 ; 2 Kinne, Comp. 528.

In this deed, no trustee was appointed to preserve the alleged contingent remainder. These parties claim the absolute and legal title—the *ultimate fee.* Under no circumstances were they to have an *equitable interest* or *title.* If their estate ever vested, it was to be a *legal one.* The grantor was seised and possessed of the whole interest, and had the absolute legal title, and the ultimate remainder to his own lawful heirs was the absolute legal interest and title. At the daughter's death, the property itself was to *belong* to the child or children, if she left living issue, but should she die without such issue, then and in that case the *property* was to *return* to the lawful heirs of the donor. The ultimate fee was the interest attempted to be limited.

2. As to the principle of the rule in *Shelly's case.*

The words heirs, or heirs of the body, when unexplained, are uniformly regarded as words of limitation, descriptive of the line of heirs to take, and not of particular individuals. To make it a word of purchase, it must be used as a designation of the person of one or more individuals who are to take, or it must be so explained by superadded words, as will vary its legal technical effect and operation. *Ewing* v. *Standefer,* 18 Ala. R. 401.

It appears to be settled, that the word, heirs, when used alone, and without explanation, is always considered as a word of limitation, and not of purchase ; that if it appears by the term heirs, the donor meant the general line of descent from the ancestor, the rule will prevail, no matter how strong the intention may appear to make them take as purchasers. If the donor meant

that every other person who should be heir should take, he meant what the law would not suffer him to do, to make *the heir* take as a *purchaser*. *Price* v. *Price*, 5 Ala. 581; *Price* v. *Telly's Adm'r*, 10 Ib. 947, 948; *Scott et al.* v. *Abercrombie et al.*, 14 Ib. 276; *Lenoir* v. *Rainey*, 15 Ib. 669, 670; *Machen, Ex'or*, v. *Machen*, 15 Ib. 375, 376; *Powell* v. *Manden*, 24 Miss. R. 362, 365; *Kay* v. *Connor*, 8 Humph. 633 : 4 Kent, 229, 230.

And in *Hamner, Adm'r*, v. *Smith*, 22 Ala. R. 441, the court say : " In short, they must fill the *character* of heirs, and then they do not take to the exclusion of other heirs." But we re-assert the ancient · canon of the common law, that where they take in the *character* of heirs, they must take in the *quality* of heirs, and consequently cannot take as purchasers.

In *Ewing* v. *Standefer*, 18 Ala. 401, it is said : " The line of descent must be traced to ascertain who are the heirs of Lydia, or were at the time of her death; having found them, shall they take as heirs of Lydia, or devisees under the will? They cannot take in *both* capacities."

The law confers the right to an equal participation in the property on all the *heirs:* the will which provides *for the distribution* *does no more.*

To test the present case by analogy, we have the words, "lawful heirs," without any other superadded terms or expressions to control their meaning. The gift is directly to the heirs *as heirs*. They take as a class. They set up title as next of kin. There being no lineal descendants of the donor, the statute of distributions must necessarily be resorted to, to settle *who* are entitled as next of kin or legal distributees, and *how* they are entitled, whether *per stirpes* or *per capita*. If the claimants do not take and cannot inherit as next of kin, they are not the class spoken of in the deed. You have to trace them out by the Statute of Distributions; and where they claim in the *character* of heirs, they must take in the *quality* of heirs, and consequently cannot take as purchasers.

The words " child or children," and " issue," contained in the deed, are confined to the daughter and tenant for life, and not to the children or issue of the donor. They cannot be synonymous with the " lawful heirs" of the grantor. And the persons required

to take, are not confined to the issue or heirs of the donor's body, but the collateral kindred, come into the line of succession. How can any other than a technical meaning be applied in a case like this, where the words signify a class of persons to take from generation to generation in the character of "heirs" of the ancestor?

These claimants are the children and children's children of John Thurman's brothers and sisters. They are not *his* heirs, the heirs of *his* body, nor *his descendants.* They claim as parties to whom *the law* distributes personal property, as a class, being "next of kin," under the statute, as they assert. The Statute of Descents and Distributions might have been *altered* time and again after the date of the deed, up to the time of the death of John Thurman, or the death of his daughter. Collaterals might have been cut out altogether, and the line of descent might have been changed.

And the donor, in his deed, having made use of the words, "child or children," "issue," and "lawful heirs," the legal inference to be drawn from the use of the different words is, that he knew their legal meaning, and used them accordingly, or why should he vary them? *Kay* v. *Connor,* 8 Humph. 633; Keyes, Chat. 189, § 246.

And there is less latitude of construction in deeds than in wills. 18 Ala. 404; 9 Ib. 719; 4 Kent, 216; 1 Tucker, Com. 135; 1 Lomax, Dig. 414, § 10; 2 Hill, Ch. R. 639; 2 Black. Com. 115; 1 Prest. on Est. 357, 358.

It is in proof, that this deed was written by Lane.

3. Under the Alabama statute, the deed, in order to be admitted to record, must be acknowledged or proved *in the circuit or county court. Sewell* v. *Glidden,* 1 Ala. 52; *Foster* v. *Mitchell,* 15 Ib. 571; *Adams* v. *Boughton's Adm'r,* 13 Ib. 746.

This deed is merely acknowledged before the clerk, and the pretended record of it is a nullity.

A voluntary deed of gift of slaves, not acknowledged or proved *in open court,* but before a clerk or justice of the peace, and recorded, is void under the Statute of Frauds, against creditors and purchasers. And the limitation prescribed by the second section of the statute, vests a *complete title* in the possessor of personal property, in favor of creditors and purchasers, which cannot be

defeated by proof that the purchaser *had notice* of the circumstances under which the possession was held. *Myers* v. *Peck's Adm'r*, 2 Ala. 648; *Foster* v. *Mitchell*, 15 Ib. 571; 4 Ib. 140, 165; 9 Ib. 144; 12 Ib. 612; 7 Ib. 739; 3 S. & M. 563; 1 Ib. 66; 8 Leigh, 88; 1 Tucker, Com. 345; 4 Bibb, 172, 337.

On the 25th of September, 1833, John Thurman, by his deed of that date, conveyed and delivered the property, absolutely, to the defendant and his wife, with a covenant of warranty against his heirs.

The answer of the defendant, in response to the bill which calls for an answer as to the consideration of this deed, and the depositions of the subscribing witnesses, Parthena Barron and Cullin Barron, explain the consideration fully, and at large.

McLaran and wife were purchasers for a valuable consideration.

McLaran was to *remove from Tuscumbia*, where he had his domicil, to Morgan county, Alabama; he was not to resume the business or occupation of a *merchant*, to which employment he had been trained, and which business he was making preparations to resume after his marriage. He was to *turn planter*—go to farming on a particular plantation, &c. In consideration of the premises, and the natural love and affection besides, which Thurman entertained for his daughter and son-in-law, he conveyed a plantation, together with the slaves in question, to defendant and his wife. Story, Cont. 72, 74, 75, 76; §§ 113, 115, 116; 24 Mis. R. 20; 18 Johns. R. 337; 2 Cond. U. S. R. 214; Chitty, Cont. 24, 25, 26, 27, and notes; 1 Caines, R. 45; 4 Munf. 63; 2 Pet. 182; 5 Cranch, 142; 8 Mass. 200; 6 Ib. 58; 2 Johns. R. 52; Comyn, Cont. 12, 13; *Hanson* v. *Buckner's Devisees*, 4 Bibb, 252.

The consideration of natural love and affection alone, is sufficient to sustain a covenant of warranty, at law or in equity. 4 Dana, 252; 4 Kent, 373; 2 Black. Com. 241; 4 Mass. 136, 137; 5 Jacob, Law Dict. 343, 344; 3 Tomlin, Law Dict. tit. Purchaser.

Defendant has been in possession ever since, claiming *adversely* to the whole world. 16 Ala. 174; 1 Hill, (S. C.) L. R. 300;

3 Pet. 52; 5 Ib. 438; 4 Yerg. 104; 1 B. Monr. Law & Eq. 153; 2 Ib. 438, 439; 7 Johns. Ch. R. 90; 4 Rand. 600; 1 Humph. 348; 6 Ib. 75, 101, 103, 163; 5 Ala. 508; 7 Ib. 249; 1 Dev. & Bat. Law R. 336.

The deed of gift, if not duly recorded, was *absolutely void* as to purchasers. The statute is not a mere registry act, but *vests a complete title in the possessor* of personal property, in favor of creditors and purchasers, without any regard to notice of the *circumstances* under which the possession was held. It is the *possession* that the statute looks to.

Thurman was in possession; had never surrendered it; and delivered possession, and conveyed by deed, with a covenant of warranty against himself and heirs, to defendant and wife. The conveyance does not purport to be a gift, and the consideration is called for, and is fully proved. And it also imported a consideration as a conveyance, with a warranty under seal.

*George S. Yerger* and *Fulton Anderson*, on same side, argued the cause orally.

SMITH, C. J., delivered the opinion of the court.

This was a bill originally filed in the Vice Chancery court, at Columbus, by the appellants against the appellee.

The object of the suit was the recovery of a number of slaves, to which the complainants allege title, in virtue of a deed of trust, which was executed by John Thurman, in Morgan county, Alabama, on the 18th of October, 1831. The complainants claim the property in controversy, in the character of heirs at law and next of kin of the said Thurman, at the death of Mrs. McLaran, who, it is averred, possessed a life interest in the said slaves.

It appears, from the allegations of the bill, that the appellee, in 1832, intermarried with Eliza Thurman, the daughter and only child of the said John Thurman, who had previously executed the deed above referred to. By that instrument, the slaves (which, with their increase, is the subject of this controversy,) were conveyed to Isaac Lane, in trust for the use of the said Eliza Thurman, then a minor. The property conveyed was to remain in the

possession of the donor without charge, until the marriage of his daughter. Upon the happening of that event, it was to be under the control of the trustee, and managed by him, as he might think most to the advantage of the donee, "so that she should have the profits of said negroes annually during her life; and after her death, to belong to the child or children of the donee; but should she die without living issue, then, and in that case, the slaves before named, and their increase, should return to the lawful heirs of the donor."

It appears, further, that the deed of trust was duly executed and delivered to Lane, the trustee, who assumed the execution of the trust duties imposed thereby; that upon the marriage of the appellee with Eliza Thurman, they were placed in possession of the slaves embraced in the deed; that they removed from the state of Alabama—where they were both domiciled at the time of the marriage—to Mississippi; having had continual possession of the slaves from the time of their delivery up to the death of the said Eliza, which occurred in 1850, in this state.

It also appears, that Thurman died intestate, in 1838, in Alabama, leaving the wife of the appellee his only child, and heir at law. That appellee administered upon his estate, the debts of which were all paid, and the property distributed between the widow of Thurman, who is still living, and the said Eliza; but that the slaves conveyed in trust to Lane, were neither inventoried as the property of the decedent's estate, nor included in the distribution; and that the wife of the appellee died without issue living at the time of her death.

The appellants are the collateral relations of the said John Thurman, being the descendants of his brothers and sisters, who were living at the time of his death.

We have, above, stated concisely the facts of the case, out of which arise the only questions which it is deemed necessary to examine.

According to elementary writers, there are four classes of contingent remainders. The first is, where the remainder depends entirely upon a contingent determination of the precedent estate itself. The second is, where some uncertain event, unconnected

with and collateral to the determination of the preceding estate, is, by the nature of the limitation, to precede the remainder. The third is, where the remainder is limited to take effect upon an event which, though it must certainly happen some time or other, yet may not happen until after the determination of the particular estate : in which case, if the event does not happen during the continuance of the particular estate, the remainder becomes void. And the fourth sort of contingent remainders is, where it is limited to a person not ascertained, or not in being at the time when such limitation is made. Fearne, Remain. 5; Cruise, Dig. tit. 16, Remainder; 4 Kent, Com. 198, 199.

There are some exceptions, recognized by all the books, to this last sort of contingent remainders. One of these, it is said, grows out of the rule in *Shelly's case.* Another depends upon the principle, which we will have occasion again to advert to, that an *ultimate* limitation to the "right heirs," or "lawful heirs" of the grantor will continue in him, as his old reversion, and not vest as a remainder, although the freehold be expressly limited away from him. And a third exception grows out of the respect which the law pays to the intention of the testator, and is recognized in cases, in which it can be plainly collected from his will, that he used the word "heir," not as a word of limitation, but as *descriptio personæ.* Hilliard, Ab. 367; Lomax, Dig. 413, 414.

Anciently, at common law, a remainder could not be limited upon a chattel, the title to which was regarded as incapable of a division into successive interests. And hence the transfer of a chattel personal to one for life, or even for a moment of time, passed the title to him absolutely. 2 Kent, Com. 352; *Price* v. *Price*, 5 Alabama, R. 581; Keyes, Chat. 13, 14. This principle has long since been departed from by the courts in England, and in this country and it is now generally conceded, that limitations of special interests in chattels personal, whether they be made by deed or will, are valid. *Mosley* v. *Bradley*, 3 Call, 50; *London* v. *Toomer*, 11 Leigh, 405; Keyes, Chat. 14. Such is, we take it, the rule in the State of Alabama, where the rights of the parties to this controversy accrued, and by whose laws they must be determined.

Harris et al. *v.* McLaran.

And the same principles which apply to the limitations of estates in regard to real property, apply, with certain recognized exceptions, to the modification of title to chattels personal.

It is evident, that under the statute of Alabama, abolishing entailments, an estate tail could not be created in chattels. Aikin, Dig. 95, § 40.   Another exception is, that an interest similar to a fee conditional cannot be created in them.   The reason assigned for the rule is, that anciently a gift of chattels personal to a person was an absolute gift; the words "heirs," or "heirs of his body," or "executors and administrators," had no effect whatever upon the quantity of interest; nor was the quantity of interest affected by the use of restrictive expressions, as "for life," or "for years."   So that when the ancient doctrine in regard to chattels personal was departed from, and partial interests in them were permitted to be created, the courts would not allow that the words, "heirs of the body," was a restriction upon a gift which was, and still is, an absolute one, in all cases, unless it be restricted; for the reason that as chattels personal generally do not descend, the heir or heirs of the body could not take, and hence the words were simply nugatory.   Fearne, Rem. 463; Keyes, Chat. 32.

Chattels personal being essentially, as it is said, the subject of absolute property, upon their transfer to one for life he at once became entitled to the whole, and the common law knew nothing of a reversion remaining in the assignor.   But courts of law and equity having recognized the validity of limitations, by which partial interests in personal chattels were created, were, of necessity, compelled to recognize reversionary interests, to the extent that they acknowledged the existence of partial interests.   Having admitted the right to bequeath a life estate in chattels, they were compelled to recognize the right to limit a remainder.

And the courts generally, concur in laying down the rule, that reversionary interests, or *quasi* reversions of personal chattels exist in all cases, both in law an equity, where partial interests alone are created in them; and in all cases in which partial interests are created, with limitations over which fail to take effect, or which are void *ab initio*, or which become void; except in those cases in

which an intention to dispose of the whole interest is apparent, and where also conditional limitations are engrafted upon interests in the first takers, which, in the absence of the conditional limitations, would be held to be absolute interests. 1 Dev. & Bat. 334; *Price* v. *Tally,* 10 Ala. 950; *Guiger* v. *Brown,* 2 Strobh. 359; 1 Bailey, L. R. 100; *Powell* v. *Brown,* 1 Com. 120; Law Repos. 469; 1 Bailey, L. R. 643; *Vannuson* v. *Culbertson,* 10 S. & M. 150.

Let us apply this principle to the case at bar, and, if it were conceded that the limitation over to his lawful heirs contained in Thurman's deed, conveying the slaves in trust to Lane for the use of his daughter Eliza, was valid, it will not be controverted that a reversionary interest remained in the donor. For, if the donee, who took a life interest in the proceeds of the slaves, died without issue living at the time of her death, before the donor, the limitation would have failed to take effect, for the obvious reason, no one could lay claim to the remainder in the character of heirs of the donor, who was still living.

But Thurman died before the donee; who, as we have seen, left no child or children living at the time of her death; consequently, the limitation over to Thurman's lawful heirs, if valid, took effect, and vested the remainder in them. This raises the question of the validity of the limitation over.

It is a settled maxim of the common law, that a man cannot make a conveyance of real property to his heirs. Hence, it is uniformly held, that an ultimate remainder, limited to the right heirs of the grantor, is void, and that although the freehold be expressly limited away from him, it will continue in him, as his old reversion and not as a remainder. The heirs will take by decent, and not by purchase, because *fortior et potentior est dispositio legis quam hominis.* Fearne on Remainders, 49, 50, 51, 52, 67; 1 Preston on Estates, 290, 291; *Godolphin* v. *Abbingdon,* 2 Atkins, 56; *Cholmondely* v. *Maxcy,* 12 East, 589; 1 Hill, Ab. 199, § 28; 367, § 31; 419, § 8; 1 Tucker, Com. 135, 138, 139, 140.

Heirs, in their character as such, do not succeed to the chattels personal of the ancestor, in virtue of the title by descent. They vest in the administrator, as assets for the payment of debts, and

Harris et al. v. McLaran.

then for distribution amongst the next of kin. But the above stated principle of the common law is as applicable to gifts of chattels personal as to devises of real property. The rule extends " to gifts," " to next of kin," " distributees," " relations," and to other gifts which by construction are to " next of kin." Keyes, Chat. 46.

And for this reason it is laid down, that a remainder in personal chattels must be limited to a person capable of taking it by purchase, or it will be void. Thus, if A. by deed convey a chattel personal to one for the life of A.; remainder to the "next of kin," " distributees," or the relations of A., a reversionary interest remains in A., and upon his death the property passes by representation and not by purchase. Keyes, Chat. 230.

So, where one bequeaths his personal property to those entitled under the statute of distributions generally, and not specially, they take by representation, and not under the testament, nor by purchase, Keyes, Chat. 230; *Masters* v. *Harper*, 4 Brown, Ch. Rep. 207; *Lowndes* v. *Stone*, 4 Ves. 649; *Powell* v. *Brown*, 1 Bailey, 100; *Holloway* v. *Holloway*, 5 Ves. 399.

In the case of *Eadings* v. *Eadings*, 10 Ala. 203; it was said by the Supreme Court of Alabama, that " when the term ' heir,' is used in connection with the personal estate only, there is no conflict in the cases, that it is to receive the construction of ' next of kin.' This term, used solely in this connection, seems to be precisely equivalent to legal representatives, and the cases are numerous where this is held to mean next of kin, and these take under the will, as under the Statute of Distributions."

This case settles the rule of construction in Alabama; and it is unquestionally settled in accordance with the uniform decisions on the subject.

According to this principle, the stipulation in the deed, by which, in the event of Mrs. McLaran's death, without issue living, the property was to return to the lawful heirs of Thurman, must be construed as a limitation to his next of kin, legal representatives, or distributees; unless it is apparent, from the instrument itself, that the word " heirs" was not used in its legal and technical acceptation, but in a restricted sense, descriptive of the persons, who as indi-

viduals, were to take, or as designating a part of the heirs at law of the donor, who in exclusion of the heirs generally, were to be the recipients of his bounty, in the event of failure of issue in the donee.

Upon this point it is insisted, that it could not have been Thurman's intention to include the donee, by the words "lawful heirs;" and that the intent to exclude her, is manifest from the very terms of the instrument, as by its express provisions, the limitation in favor of the heirs of the donor could not, by any possibility, take effect until after the death of the donee, his only child, without issue living at the time of her death.

The argument is not without plausibility; and if there was any part of the instrument, or any associated word or phrase, which, in the slightest degree, authorized the inference that the donor used the words "lawful heirs" in a restricted sense, and thereby intended to exclude the present object of his generosity, beside the gift of the property to her for life, and her children afterwards, if there should be any, it might possibly be conclusive; but there is nothing in the instrument, except the limitation for the use of the donee and her issue, which, as it is truly said, must terminate by her death and the failure of issue, before the remainder to the heirs could vest, which, upon any principle, would warrant this court in placing upon these words in the deed, a different interpretation from that which the law has affixed to them.

We cannot indulge in any hypothesis as to the intention of the donor. We can only know that intention, by referring to the language which he has employed, and to those associated circumstances which the law has declared shall indicate his wishes. The terms "lawful heirs," "right heirs," and "heirs," are synonymous: their signification is fixed by the law; and when they are used in a deed or will, without any superadded words or phrases, indicating a different meaning, they are always understood to be used according to their legal acceptation. The deed contains no evidence upon its face, that Thurman used the term "lawful heirs" without a distinct knowledge of its legal import. In fact, if any inference could be legitimately drawn, a contrary one would arise, from the appropriate manner in which the terms "child," or "children,"

"issue," and "lawful heirs," are applied. *Kay* v. *Connor*, 8 Humph. 638.

We cannot doubt, therefore, that the words "lawful heirs" of the donor, should not be understood as descriptive of particular persons, who were intended to take as individuals, and therefore as words of purchase, but as designating the entire stock of heirs who would be entitled to succeed as the next of kin, or distributees, to the personal estate of the donor; and hence as words of limitation.

The result necessarily follows, from the principles above laid down, that the limitation to the heirs of the donor was void, and consequently the property vested absolutely in the donee, who, it is admitted by counsel for the appellants, held a life interest in the property.

But if it were conceded that the property conveyed by the deed did not vest absolutely in Mrs. McLaran, the limitation to the "lawful heirs" of Thurman being void, he retained, under the operation of the deed, a reversionary interest; that is, a possibility of reverter, which, upon his death, vested in his legal representatives.

It is manifest that this concession could not aid the appellants, as it is settled, that the limitation of a life estate to the donee, could not prevent her from taking by distribution, as the heir at law of the donor, and his next of kin.

In the case of *Holloway* v. *Holloway*, 5 Ves. 399, £5,000 were bequeathed for the use of the testator's daughter for life; and after her death, to such child or children as she should leave at her decease, in such shares as she should think proper; and in case she should die, leaving no child, then, as to £1,000, part of the bequest in trust for the executors, &c., of the daughter; and as for the remainder of the bequest, in trust for such person or persons as should be the heir or heirs at law of the testator; it was held, that the £4,000 vested in the legatee and the two other daughters of the testator, who were co-*heiresses* at law of the testator, and next of kin at his death.

In this case, it was said by the Master of the Rolls, if a life estate was devised to one, and after his death to the right heirs of

the testator, it never would be held, that though the tenant for life was one of the heirs, that would reduce him to a life estate; but he would take a fee. The same doctrine has been repeatedly recognized. *Powell* v. *Brown*, 1 Bailey, 100; *Masters* v. *Hooper*, 4 Brown, Ch. R. 207; *Doe* v. *Lawson et al.*, 3 East, 290; Keyes, Chat. §§ 282, 301.

The intervention of the trustee in this case, could have no effect upon the question. He was not appointed to preserve the contingent remainder limited to the heirs at law of the donor; for in no event were they to take an equitable estate: but under the limitation, they would have been entitled to the legal fee in the property.

Upon this view of the subject, when Thurman died, his reversionary interest vested in his legal representatives. Mrs. McLaran, who survived him, as his heir at law and next of kin, was, with the widow, entitled to distribution upon his estate. Hence, it is perfectly immaterial to the appellants, whether the appellee became entitled to Thurman's reversionary interest, or whether it belonged to his wife, as her separate estate; as they claim as the heirs of Thurman, and not of Mrs. McLaran; in virtue of the limitation to them contained in the deed.

There is another view of the subject, equally fatal to the title insisted on by the appellants.

They claim as the heirs of John Thurman, and in virtue of the limitation contained in the deed. To make good their title, it is essential that they should show that they stand in that relation to Thurman. They are the lineal descendants, the children and grandchildren of his brothers and sisters, who were living at the time of his death, which occurred in 1838. To determine who are the heirs of Thurman, we must ascertain the persons who were entitled to distribution of his estate, as next of kin. For the term "heirs," as used in the deed, is precisely equivalent to next of kin; and the next of kin could only be ascertainable at the time of the intestate's death, as it is precisely at that point of time that their rights as such become as much fixed as the right of the heir is by the common law, upon the death of the ancestor. This rule is uniformly held by the courts. 2 Prest. Est. 37; 2

Atk. 57; 12 East, 589; *Holloway* v. *Holloway*, 5 Ves. jr. 399; *Doe* v. *Lawson*, 3 East, 290.

It is evident, therefore, that appellants were not the heirs of Thurman; or—which is something, as to the question before us— were not the persons who, as next of kin, were entitled to distribution on his estate. It is equally clear, that they were neither the heirs nor distributees of Mrs. McLaran, who died in 1850; (although, if Thurman had died intestate, without issue, they might have been entitled, as his next of kin;) as her husband, the appellee, and her mother survived her.

We close our investigation of this case, with this examination of a part of the questions which have been learnedly and ingeniously discussed by counsel. And believing that there was no error in the decree of the vice-chancellor, we order it to be affirmed.